### No. 2947.

### C. R. PAINTER *v.* THE STATE.

1. BURGLARY—EVIDENCE—FACT CASE.—See the statement of the case for evidence *held* sufficient to establish a burglarious entry at night of the house by the accused, and therefore to support the conviction for burglary.

2. SAME—CHARGE OF THE COURT.—A special charge of the court was requested by the accused to the effect that if the jury found that there were large openings in said building, so situated as to admit of an easy entrance without force, and that the same could have been naturally used for said purpose and had been used for said purpose, and that at the time said property was taken an entry was made through either of said openings or unfinished ends, then the defendant is not guilty. *Held,* that the trial court did not err in refusing the said special charge, because, as the openings referred to were unusual places of entry, an entrance through either of them would be a burglarious entrance.

3. SAME—VARIANCE.—INDICTMENT alleged the ownership of the house to be in E. W. Bullard. The ownership of the house was proved as alleged, and it was further proved that the said E. W. Bullard permitted his son to store corn in the said house. *Held* that such proof does not amount to a variance between the allegation and the proof.

APPEAL from the District Court of Parker. Tried below before the Hon. G. A. McCall.

The conviction in this case was for burglary with intent to commit theft, and the penalty assessed by the verdict was a term of two years in the penitentiary.

J. W. Bullard was the first witness for the State. He testified that he formed the acquaintance of the defendant in the town of Weatherford, Parker county, Texas, on the first Monday in October, 1887, on which occasion the defendant and the witness traded horses and saddles. Witness's horse being a better animal than that of the defendant, and the defendant's saddle being a better one than that of the witness, they traded even. At this point the State exhibited a pair of saddle pockets to the witness and he identified them as the pockets which were attached to the saddle received by the witness in the trade with the defendant. A pair of patent buckles were then exhibited to the witness and he identified them as the pair of patent buckles that were attached and pertained to the saddle which he received in the trade with the defendant. During the fall of 1887 the witness lived at the place of his father, E. W. Bullard, which was situated in Parker county, about twelve miles north from the town of Weatherford. The witness left his said home on the afternoon of October 12, 1887, to look for some cattle. It was quite late in the evening when he got back home. When he took the saddle off his horse he first hung it on a fence. He then removed it to an enclosed hall between two cribs, and hung it up, the saddle pockets and patent buckles being then attached to it. Witness and his father then worked about the crib and lot until it began to get dark. At good dark they went to the house, and, just before leaving the lot, the witness tied the crib hall door securely with a rope. The witness did not remember whether or not the said door was still tied when he reached the lot on the next morning, which was after his father had reached it. When he went into the hall between eight and nine o'clock on that morning, to get his saddle to put on his horse, he discovered that the saddle pockets and the patent buckles were gone. The witness and his father thereupon made an examination of the premises for traces of a burglar. They found but one track of a person near the crib, and that was on the west side of the same,—the said crib standing north and south. That impression showed only the heel and ball of the foot. They then looked over the ground inside of the lot and found the track of a boot about No. 5 in size, going towards and from the crib. Thence they trailed that track to a point in the brush about one hundred yards distant from the crib, where, apparently, a horse shod in front had been recently tied. At this point the boot track dis-

appeared, and the witness and his father trailed the horse or pony track to the Weatherford road. The track on the road showed that the pony had come to the vicinity of the crib from the direction of Weatherford, and had gone back towards Weatherford. Witness then returned to the crib, got his horse, and followed the pony track in the direction of Weatherford to a point beyond Shelmuts's house, and thence he rode direct to Weatherford. Upon information obtained in Weatherford, the witness swore out a complaint against the defendant before Justice of the Peace Squyres. He then took the warrant with him to Springtown, and got Constable Whatley to go with him in search of the defendant. They found him at the village of Azel, in Tarrant county, and they found the said saddle pockets and patent buckles on his saddle.

The witness described the house as follows: "The house in which my saddle was hanging on that night was three cribs, or two log cribs about eight feet apart, leaving a space between of about eight feet, which said space and the said cribs were covered by the same shingle roof. The space was then boxed up with plank nailed on straight up and down. Some of the planks did not quite reach the plates, and in the back or west side there was a hole at the top about eight by twenty inches in size, and was about eight feet from the ground, making a space large enough to have admitted the defendant's body. On the east or front side it was boxed up with plank straight up and down like the other, and had a good sized door. In the east side over the door was a space about twelve by thirty-six inches in size, about seven or eight feet from the ground. This space was large enough to admit the passage of the defendant's body by a tight squeeze. It was in this hall or room that my saddle was hung on the night in question. I had two or three loads of corn in this place. The cribs and all belonged to my father, but he had allowed me to put my corn in the south crib, and the two or three loads I had in the entry were put there by my father's consent. My father had his corn in the north crib. The gable ends of the said cribs were left open. There was a stable built on the south end of the house or crib, which stable was covered, and the fence joined the stable. A man might have climbed on the fence, then on the stable, then in at the gable end of the crib, then over the corn, then down into the hall and got at the saddle pockets. There was a door in the north crib on the east side, and a door to the hall that I have described. There is a

door from the hall or middle crib into the south crib. There was no door to the south crib from the outside."

Concluding his testimony in chief, the witness stated that the said hall or middle crib was entered, and the saddle pockets and patent buckles were taken therefrom without his knowledge or consent. The pony which the defendant had in his possession when arrested was the pony which the witness traded to him a few days before. It was then shod in front, and, to the best of the witness's belief, was the same pony that was tied to the brush near the crib on the night of the burglary, and whose tracks the witness trailed over the road towards Weatherford, past Shelmuts's house. This opinion was based upon the witness's knowledge of the animal's tracks.

Cross examined, the witness said that he was a married man, but had been separated from his wife, and had lived at his father's house for the two years preceding this trial. When arrested in Tarrant county, the defendant was hauling cotton, and did not have the saddle, saddle pockets and buckles with him, but he told the witness and Whatley where they would, and where they did, find them. When arrested, the defendant at first denied taking the saddle pockets and buckles, but presently said: "I might as well confess. I did not get the saddle pockets and buckles myself, but I got another fellow to get them for me." He did not say who the party was he got to take them. The defendant wore a pair of boots about number five in size. The witness tied the door of the hall or middle crib on the night of the burglary to keep out an old cow of his father's that was in the habit of breaking into it at night. The witness denied that he ever told Sam Coffman or any other person, in Azel or elsewhere, that "if his father remembered tying the doors, it would go hard with the defendant."

E. W. Bullard was the next witness for the State. He testified that the prosecuting witness, J. W. Bullard, was his son, and lived at his house, about twelve miles from Weatherford, in Parker county, in October, 1887. The witness had no recollection of ever having seen the defendant prior to his examining trial upon the charge of having committed this offense. Said J. W. Bullard left witness's house on the afternoon of October 12, 1887, to ride over the range in search of certain cattle. He got back to the cribs a little before sun down. As soon as he got back, he took his saddle from his horse and hung it on the fence, and proceeded to make some calculations,

figuring on his saddle pockets. About sun down he took his saddle from the fence and carried it into the enclosed hall between the two cribs. The two said cribs belonged to the witness, but he had permitted his son to put a large quantity of his corn in the south crib, and two or three loads of the same grain in the hall described. Witness kept his corn in the north crib. Witness and his said son finished feeding the stock at the said cribs about good dark on the night of the said October 12. Just before starting to the house, the witness got a rope and began to tie the door to the hall, but his son asked him not to tie it then, as he had to go into the hall again. Witness did not tie the said door, but, just before going to the house, he saw his said son go to the said door and manipulate the rope long enough to have tied it, and in a manner to indicate that he was tying it. It was good dark at this time. That door was customarily tied at night to prevent a breachy cow from depredating on the corn. Witness's son missed his saddle pockets and buckles when he went to saddle his horse, between eight and nine o'clock on the next morning. Witness and his son at once made an examination of the premises, and found a single foot track on the west side of the crib, beneath the hole in the west side of the hall. It looked to witness as if the person who made that track must have jumped down from the side of the house, as the heel sunk deep into the ground, which was too dry to receive much of an impression from the ordinary pressure of a foot. Witness and his son then made a circle, and found a small track leading towards, and then from, the direction of the cribs. They followed that track to a tree in the brush, where it was apparent a horse had been recently tied. At that point the foot tracks disappeared, and the horse tracks —or rather pony tracks, shod before—were thence followed to the Weatherford road. The tracks on the said road showed that the pony came to the tree in the brush from the direction of Weatherford, and that it went back over the same road, towards Weatherford. The crib was not entered on that night by the consent, nor with the knowledge of witness.

This witness described the cribs, etc., as follows: " This house or cribs set north and south, and were built by building two square cribs out of logs, and leaving a space between them of about eight feet. The cribs that were built of logs were about twelve by fourteen feet in size, and the hall between was about eight by twelve feet in size. These cribs and hall were

covered with shingles, and all were under one roof. The hall was enclosed by boxing up the ends with planks, straight up and down. On the west side of the hall the planks lacked a little of reaching the top plate, and a small man might possibly crowd over them. I crawled through there one time after that, and I am a little larger than the defendant. This hole was about eight feet from the ground, and is the one beneath which we found the track. The east side was boxed up with planks in the same manner, with a medium sized door on the said east side. There was a hole over that door, seven or eight feet from the ground, about twelve by thirty-six inches in size, through which a small man could go. There was one small door to the north crib on the outside, and the door to the south crib was in the hall. The gable ends of the house were not closed. There was a shed on the south side of the south crib we used for horses to stand under. The fence joined that shed. A person might climb on the fence, then climb on the shed, then in at the end of the south crib over the corn, and down into the hall where the saddle, saddle pockets and buckles were."

Cross examined, the witness said that the south crib and hall were used by J. W. Bullard, by his consent, to house his corn, and he had two or three loads of corn in the hall at the time of the burglary. Witness did not see his son tie the hall door, but saw him manipulating the rope about the time he, witness, left the cribs to go to the house. The hall from which the saddle pockets and buckles were taken was customarily used as a storing place for saddles and harness. The gable ends of the cribs were used for no specific purpose, but sometimes ear corn was thrown into the cribs through them, and arranged in the cribs from them. The said cribs were immediately west of and in full view of the witness's house. The track found at the cribs was immediately under the hole in the west side of the hall. Witness crawled through that hole once from the inside. Witness's son, J. W. Bullard, made his living chiefly by trading.

W. A. Shelmuts testified, for the State, that he lived on the Weatherford road, about eleven miles north from Weatherford, and about one mile south from E. W. Bullard's house, between the said house and Weatherford. He first saw the defendant on the evening of October 12, 1887. Witness was then in his wagon, about four miles from his home, going towards his home. Defendant rode up and asked the witness the way to "Trading Jim Bullard's," and if the said Bullard had any horse

feed, as his horse was hungry, and he was going to spend the night at Bullard's and wanted his horse fed. He then told witness that he and Jim Bullard had traded horses and saddles in Weatherford a few days before. Witness told him that he was on the direct road to Bullard's house, and he rode along in company with witness until they reached a point within about a mile of witness's house, when he rode on, leaving the witness. The sun was about half a quarter high when the defendant left the witness. The last the witness saw of the defendant, until he saw him at the examining trial, he was riding towards Bullard's house on a small pony shod in front. On his cross examination, the witness said that he saw. J. W. Bullard the next morning, following the trail of a small pony shod in front which he, witness, believed to be the trail of the pony ridden by the defendant on the evening before.

Will Byrne testified, for the State, that he was a saddler by trade, and lived in Weatherford, Texas. On the morning of October 13, 1887, between six and seven o'clock, the defendant came to the witness's saddle shop and got the witness to attach to his saddle a pair of saddle pockets that he brought with him. The witness identified the saddle pockets in evidence as the same.

The State closed.

Sam Coffman was the first witness for the defense. He testified that he lived near Springtown, in Parker county, but in October, 1887, he lived at Azel, in Tarrant county. He saw the State's witness J. W. Bullard when he came to Azel and procured the arrest of the defendant. In the course of a conversation in the shoe shop of the witness, the said J. W. Bullard said that if his father remembered tying the crib door, the prosecution would go very hard with defendant.

On his cross examination, the witness said that he did not remember that any person was present at the time of the conversation referred to. A few days before his arrest the defendant came into the witness's shoe shop and asked witness what would color a pair of saddle pockets, stating that he had a pair he wanted colored. Witness told him that the solution used by shoemakers to color the edges of shoe soles would color a pair of saddle pockets. Witness remembered but the one conversation mentioned with J. W. Bullard. He had known defendant two or three years, and during that time his reputation for hon-

esty was good. He was about eighteen years old, and had no relative that witness had ever heard of.

J. W. Freeze testified, for the defense, that he had known the defendant for several years, during which period he had sustained a good reputation for honesty and fair dealing. Defendant lived with witness, and had no other home, and no relatives, so far as the witness knew. Witness was on his bond. Defendant was under indictment in this county for the theft of the saddle pockets. Witness had tried to get the sheriff and county attorney to let the defendant off from this trial.

On his cross examination, this witness denied that he ever told Sheriff Sisk, of Parker county, that he had better "go slow" in this case, and that he, witness, had a great deal of influence in Parker county, and that he would help Sisk at the next election if he would help this boy, defendant, out of this trouble. Nor did he make such a statement to the county attorney. He did ask Sheriff Sisk to help him get a continuance before this trial.

The defense closed.

James Young, James Doughty and George Clingman, witnesses for the State, testified that the general reputation of the defense witness J. W. Freeze for truth and veracity, in the community of residence, was bad.

H. S. Sisk, sheriff of Parker county, testified, for the State, that the defense witness J. W. Freeze came to him at the previous term of the court and told him to "go slow" about this case; that he, Freeze, had a great deal of influence in Parker county, which he would use in behalf of witness if witness would help the defendant out of this trouble.

Deputy Sheriff Felix Osborn, of Tarrant county, testified that he was present in Sam Coffman's shop on one occasion and heard a conversation between J. W. Bullard and Sam Coffman about this case. In that conversation Bullard told Coffman that he tied the door of the hall between the cribs on the night of and before the burglary. He said nothing in that conversation about it going hard with defendant if his, Bullard's, father remembered tying the door. Bullard and Coffman may have had other conversations about this case, of which the witness knew nothing.

Constable Whatley testified, for the State, that he heard a conversation between J. W. Bullard and Sam Coffman in Coffman's shop in Azel, on the day of defendant's arrest. Bullard

told Coffman that he tied the crib door on the night of the burglary. He said nothing in that conversation about it going hard with defendant if old man Bullard remembered tying the door. Bullard and Coffman may have had other conversations of which witness knew nothing.

*Richards & Kuteman*, for the appellant: We submit, as propositions of law, First. The defendant, in a criminal case, is entitled to a charge upon every material issue or defense presented by the evidence. Second. In a case of burglary, where the charge is an entry at night with force, threats or fraud, and the proof is that the stable was in an unfinished condition with two open gable ends on the north and south, and two large holes on the east and west, at either of which an entry could have been made without force, threats or fraud, and the evidence tends strongly to prove that the entry was effected through a door not shown to be closed, or through one of said openings, and not through the closed door way, then the defendant is entitled to a requested charge to the effect that if the entry was effected through one of said openings, without force, he was not guilty of burglary.

The building consisted of two parallel log cribs, extending east and west with a space between of eight feet. These two cribs and intervening space were under one shingle roof, the comb of which extended north and south. The eight feet between the cribs had been converted into a hall, by placing perpendicular plank on the two open ends, and a door made therein on the east side. Over this door there were no plank to reach the plate or sill above, and a hole thirty-six by twelve inches was left above the door. On the west side the plank also failed to reach the top, leaving a hole twenty by eighteen inches, which opening was about eight feet from the ground. All the gable ends of the building on the north and south were open and about nine feet from the ground. These gable ends had been used for the purpose of throwing in corn, and had been used as a place of entry for the purpose of arranging the corn. On the south side a shed joined the crib just below the open gable end, and a fence joined this shed. So that by climbing on the fence a person could walk across the shed, into the open gable end, and down into the hall or space between the cribs. Or he could have entered the hall through the other gable end, or through either of the said holes on the east and west side of

the hall, or he could have entered through the door into the north crib, then over partition wall into the hall, and out through the west openings. In this hall the pockets were kept the night it is alleged they were taken. The door on the east side had been tied with a rope the night before, but the evidence fails to show that it was untied the next morning, or any other circumstance indicating an entry through said door. The evidence further shows a door in the south crib leading into the hall, and a door in the north crib, neither of which is shown to have been closed. Neither does it show there were no other doors to said building. A track just under the hole on the west side tends to prove that the party left the building through that hole. Through this hole the owner of the building had passed, who is a grown man, while the defendant is smaller, being a boy eighteen years old.

Under this state of case the defendant requested the court to instruct the jury in effect that, if there was a large opening in said house, such as an unfinished gable end which had been used before as a place of entry, and was accessible and easy of entry without force, and the jury believed he entered at such opening, then they should acquit. (1 Whart., arts. 759, 768, 769; Jones v. The State, 25 Texas Ct. App., 226; Melton v. The State, 24 Texas Ct. App., 287.)

The theory of the defense was that an entry could have been made through either of the two open gable ends, which were only about seven feet from the ground and easy of approach by means of a shed, or through either of the two holes on the east and west side of the hall, or through either of the two doors, which were not shown to be closed. The evidence shows that the gable ends had been used as a place of entry when unloading corn, and other purposes, and that the owner once went through the hole on the west side. In view of this evidence defendant requested a special charge to the effect that if the jury found that there were large openings in said building, so situated as to admit of an easy entrance without force, and that the same could have been naturally used for said purpose, and had been used for said purpose, and that at the time said property was taken an entry was made through either of said openings or unfinished ends, then the defendant is not guilty, which charge the court refused to give, but instead thereof charged the jury that any entry without the full consent of the owner, or any entry through an unusual place, constituted bur-

glary. (Hamilton v. The State, 11 Texas Ct. App., 116; Weeks
v. The State, 13 Texas Ct. App., 466; Sullivan v. The State, Id.,
466; Lott v. The State, 17 Texas Ct. App., 598; Jones v. The
State, 25 Texas Ct. App., 226.)

The court erred in refusing charges requested by defendant
to the effect that, if they found that the room from which the
property was taken was owned or controlled by another person
than the party alleged in the indictment, they should acquit.

The indictment alleges that the building from which the
property was taken was owned by E. W. Bullard. The evi-
dence tends to show that the particular room in which the sad-
dle was kept was in the exclusive use and control of J. W.
Bullard. In view of this testimony, the defendant requested
special charges to the effect that if the room or hall from which
the pockets were taken was in the exclusive control and use
of J. W. Bullard, then they should acquit. (Webb's Texas
Crim. L., 505.)

The verdict is contrary to the evidence in this, that all the
evidence tends to show that defendant did not enter the house
through the hall door, if he entered at all, but through a large
opening that had been used before as a place of entry, and was
easy of access, and could be entered without force or through
the door in the north crib.

We specially call the court's attention to the fact that there
is no evidence to show that a burglary was committed in the
night time, as alleged. The loss was discovered about nine
o'clock in the morning. This court will take judicial knowl-
edge of the fact that at that time the sun rose about twenty
minutes after six o'clock. Therefore, from thirty minutes be-
fore sun rise to nine o'clock it was three hours and ten minutes.
There is not a single circumstance to rebut the presumption or
exclude the theory that the entry was effected during this time
—and this is a case of circumstantial evidence.

*W. L. Davidson*, Assistant Attorney General, for the State.

HURT, JUDGE. This conviction is for burglary. There were
two openings into the house through which an entry could have
been made. The only usual place of entrance was closed late
on the evening of the night of the burglary. While the other
places or openings were sufficiently large to admit of an entry
by an individual, still neither was a usual place of entrance.

Now, it follows from the provisions of the code that, whether the entry into the house was by untying a rope which secured the door to the house, or by entering at the other openings, the other ingredients attending, burglary would be the result. The facts, though circumstantial, exclude the idea that there was more than one door to the house, or that there was more than one usual entry. (Penal Code, arts. 704, 708; Anderson v. The State, 17 Texas Ct. App., 309, 311; Hamilton v. The State, 11 Texas Ct. App., 120; Martin v. The State, 21 Texas Ct. App., 1; Carr v. The State, 19 Texas Ct. App., 658.)

But counsel for appellant contends that the proof fails to show that the entry was at night. The circumstances render it morally certain that the entry was at night. Of this there can be no reasonable doubt.

There were no exceptions reserved to the charge of the court. Taken as a whole, we think it was correct—at least without prejudice to appellant.

The requested instructions were properly refused. The court had already instructed the jury with reference to the rules and principles governing a case depending for conviction upon circumstantial evidence. The requested instructions relating to the fact that the house had several places of entrance were properly refused, because the proof showed them to be unusual places of entering the house; and hence, if appellant entered at either of these places, he would be guilty so far as the question of entering is concerned.

The indictment alleged that the house was owned by E. W. Bullard. This was true, and the fact that E. W. Bullard permitted his son to house some corn therein does not affect this fact. There is no variance between the allegation and proof. That appellant entered the house at night and stole the saddle pockets is beyond question; and that the entry was burglarious is made to appear with reasonable certainty.

The judgment is affirmed.

*Affirmed.*